cr4-555.benson 



TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-94-00555-CR







Larry Donnel Benson, Appellant



v.



The State of Texas, Appellee







FROM THE CRIMINAL DISTRICT COURT NO. 2 OF DALLAS COUNTY


NO. F94-39626-LI, HONORABLE JOHN FORBIS, JUDGE PRESIDING







PER CURIAM


 A jury found Larry Donnel Benson guilty of unlawful delivery of cocaine. (1) The
court assessed punishment at forty-five years' imprisonment. By one point of error, Benson
challenges the factual sufficiency of the evidence to support his conviction. We will affirm the
judgment.



Standard of Review 


 When conducting a factual sufficiency review, we do not view the evidence in the
light most favorable to the verdict. Instead, we consider all the evidence equally, including the
testimony of defense witnesses and the existence of alternative hypotheses. Orona v. State, 836
S.W.2d 319, 322 (Tex. App.--Austin 1992, no pet.). We will set aside a verdict for factual
insufficiency only if it is so contrary to the overwhelming weight of the evidence as to be clearly
wrong and unjust. Stone v. State, 823 S.W.2d 375, 381 (Tex. App.--Austin 1992, pet. ref'd as
untimely filed).

 The jury charge provided as follows:



Now, if you find from the evidence beyond a reasonable doubt that . . . LARRY
DONNEL BENSON, acting alone or as a party with intent to promote or assist the
commission of the offense, if any, solicited, encouraged, directed, aided or
attempted to aid another person to knowingly or intentionally deliver, to-wit: a
controlled substance, namely: COCAINE, in an amount by aggregate weight,
including any adulterants or dilutants, of less than 28 grams, to T.A. KING, then
you will find the Defendant guilty of the offense of delivery of a controlled
substance.



Evidence


 Five people testified at trial, three for the State and two for the defense. Some
documentary evidence was admitted.

 Officer Terrence King was the undercover narcotics agent assigned to investigate
a complaint about drug selling at a house in Dallas. When he knocked on the front door, he was
directed to the back of the house. John Williams answered the back door and asked what King
wanted. King requested two "dimes"--two ten dollar rocks of cocaine. Williams told him to come
into the kitchen. King gave Williams $20. He told Williams he needed to go to the bathroom.

 As Williams led him to the bathroom, they passed through a bedroom where people
were smoking crack. They arrived in a second bedroom occupied by Benson and another man. 
The bedroom was well-lit from an overhead light. Benson was standing by a dresser. Williams
told Benson that King wanted two dimes. Benson appeared to get the rocks out of a dresser
drawer. He gave them to Williams. King then went to the bathroom.

 As King returned from the bathroom, Benson aimed a shotgun at his head; the
barrel was approximately eighteen inches from King's head. When King did not flinch, Williams
said he had told Benson that King had been there before. Benson gradually lowered the weapon. 
King whined that he wanted more for his money, so Benson got a few more crumbs of crack from
the dresser drawer and handed them to Williams. Benson remarked that King was "kind of
greedy." Williams then gave King the rocks and crumbs. Williams escorted King back out
through the kitchen.

 King sought and received arrest and search warrants for the house. He identified
Williams and Benson as "John Does" since he had not previously met them and did not know their
names. He described Benson as a "black male in his 30s, approximately five nine, 160 to 170
pounds." When executing the warrants, King went to the bedroom where he had received the
crack. There he found Sherie King, holding a mirror with cocaine residue, and Benson, loading
a shell into a shotgun.

 On cross examination, King acknowledged variance between his description of the
dealer in his report and Benson's appearance at trial. His report described the dealer as a 34-year-old, five-foot-seven-inch, 160-pound man. At trial, King said Benson appeared to be 160-170
pounds and taller than five-foot nine inches. He said that being confronted with a gun barrel
distorted his perception of things like height and weight but "[s]omeone you (sic) put a gun on you
you do not forget their face at all, period," he said.

 King admitted that he saw the dealer in the bedroom for a total of one minute when
buying the crack. He admitted that, for part of that minute, he saw the dealer from the side; he
said that he got a full-frontal view when the dealer pulled the gun on him. He also admitted that
he reported and remembered no gray in the dealer's hair when he purchased the drugs. He said
that the dealer's hair was closely cropped, much shorter than Benson's was at trial. 

 Other witnesses for the State were Andrea Bunn and Officer Xavier Castillo. Bunn,
a chemist, confirmed that the substance King purchased contained cocaine. Castillo, who helped
execute the search warrant, identified Benson as the man King arrested; Castillo had not seen
Benson before the raid. He also testified as to the chain of custody of the shotgun seized from
Benson during the raid.

 John Williams confirmed that he had been arrested, charged, and convicted on his
plea of guilty for delivering cocaine to King. He was sentenced to fifteen years' incarceration. 
He knew Benson from high school.

 Williams described standard operating procedures at the drug house that differed
from King's account. Williams said buyers were allowed into the house, but only into the first
room. They would make their transaction and leave, a procedure he described as "sco' and go."

 He said that he had the back door open when King walked up because he had seen
King arrive. Williams already had the crack packaged, in his pocket, and ready for quick
exchange. King gave him $20 and Williams delivered the crack. King then left; customers were
not allowed to use the restroom. Benson was not at the house that day.

 Benson was visiting Williams on the day of the raid. They were listening to music. 
He did not know who owned the shotgun, but recalled that someone named Hammy or Hammond
had brought it to the house.

 On cross examination, Williams admitted that he had told the prosecutor a slightly
different story in his holding cell the day before his testimony. He had not recalled some details
of the exchange very well. He also said that the prosecution had not asked questions at the
meeting that touched on some of the details he provided at trial. Williams explained that the
differences arose in part because, between the meeting and his testimony, he had thought about
the incident.

 Sherie King testified with her counsel on hand to help guard her right against self-incrimination. She nevertheless admitted to possessing a rock of crack during the raid and to
being on probation. She knew Benson because he had attended school with her older siblings. 

 She had been to Williams's house occasionally to buy drugs. She sometimes
would spend two to three days at a time at the house, though her family home was her primary
residence. She had stayed at the house the three days before the raid. She did not see Benson
there until the day of the raid.

 On cross examination, she admitted to being strung out on drugs while at the house,
but insisted that she had a good memory. She said she had not stayed at the house for a while
before the night of the drug sale. She later said that she had never stayed overnight at Williams's
house until the night of the drug sale.

 Other evidence key to this appeal includes the photograph of Benson taken when
he was arrested. Officer King said that the photograph accurately depicted Benson's appearance
then. He noted that Benson had grown longer hair and facial hair since the picture. 



Discussion


 Benson relies on the relative credibility of the witnesses to support his argument. 
He contends that Officer King did not have enough time or the proper exposure to positively
identify him. He argues that these deficiencies show in discrepancies between the description in
Officer King's report and Benson's appearance at trial--e.g., the gray in Benson's hair at trial
unmentioned in the report.

 Benson contrasts these deficiencies with the defense witnesses' disregard for the
self-incriminatory nature of their testimony. He posits that neither of these witnesses stood to gain
by lying about whether Benson was involved in the drug sale. He contends that Williams's
version makes more sense than Officer King's testimony about being allowed into the house. He
argues that a drug seller like Williams would not let people into interior rooms of the house and
would not have to get his crack from someone else in the house.

 The State, of course, rejects these arguments. It argues that the discrepancies
between Officer King's descriptions and Benson's appearance at trial are minor and explainable
due to the passage of time--e.g., the gray in Benson's hair at trial was not so obvious when it was
close-cropped; further, the jury could judge for itself from the post-arrest photograph whether
Benson's appearance had changed. The State downplays Williams's disregard for self-incrimination because, when he testified, he was already incarcerated for his role in the drug
sales. It notes some internal inconsistency in Sherie King's testimony regarding when she first
stayed overnight at Williams's house. The State points out that, had events gone as Williams
described (a one-on-one transaction), Officer King would have had no basis to swear out two John
Doe arrest warrants.



Conclusion


 This case presents a credibility standoff between the opposing sides' witnesses. 
The defense has established an alternative hypothesis, but its version is not, as it must be under
the standard, markedly more plausible than the version accepted by the jury. The verdict is not
so against the overwhelming weight of the evidence as to be clearly wrong and shock our
conscience. 

 We overrule the point of error and affirm the judgment.


Before Justices Powers, Kidd and B. A. Smith

Affirmed

Filed: August 23, 1995

Do Not Publish

1.   Controlled Substances Act, 71st Leg., R.S., ch. 678, sec. 1, § 481.112(a),(b), 1989
Tex. Gen. Laws 2230, 2935 (Tex. Health & Safety Code Ann. § 481.112, since amended).